**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

AMERICREDIT FINANCIAL SERVICES, INC., *et al.*,

                    Plaintiffs,

    vs.

PAUL KATAUSKAS,

                  Defendant.

Case No.: 2:26-cv-01350-GMN-DJA

**ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER & MOTION FOR PRELIMINARY INJUNCTION**

Pending before the Court is the Motion for Temporary Restraining Order ("TRO"), (ECF No. 8), Motion for Order to Show Cause, (ECF No. 9), and Motion for Preliminary Injunction, (ECF No. 10), filed by Plaintiffs AmeriCredit Financial Services, Inc. d/b/a/ GM Financial and GM Financial Bank. Defendant Paul Katauskas filed an omnibus Response, (ECF No. 16), to which Plaintiff replied, (ECF No. 19). Also pending before the Court is the Motion to Shorten Time, (ECF No. 11), filed by Plaintiffs.[1]

Because Plaintiffs fail to demonstrate a likelihood of success on the merits, the Court DENIES the Motion for a Temporary Restraining Order, Motion for Preliminary Injunction, and Motion for Order to Show Cause.

**I.      BACKGROUND**

This case arises out of Defendant Paul Katauskas's alleged misappropriation of numerous files containing Plaintiffs' confidential information and trade secrets (*See generally* Compl., ECF No. 1). In early 2018, GM Financial began efforts to establish a state-chartered industrial bank—commonly referred to as an Industrial Loan Company or ILC. (Donnelly Decl. ¶ 12, Ex. A. to Mot. TRO, ECF No. 8-1). ILCs permit an auto lender to operate as an FDIC-

---

[1] The Court set an expedited briefing schedule for the Motion for Temporary Restraining Order. (*See* Min. Order, ECF No. 12). The Court therefore DENIES the Motion to Shorten Time, (ECF No. 11), as moot.

insured depository institution without certain regulations. (*Id.*). ILCs are "notoriously difficult to establish." (*Id.* ¶ 10). GM Financial sought to charter an ILC called GM Financial Bank. (*See generally id.*).

To establish GM Financial Bank, GM Financial was required to submit applications to, and secure the approval of, the FDIC and the Utah Department of Financial Institutions ("UDFI"). (Compl. ¶ 14). Between 2018 and 2020, GM Financial worked to prepare the required application and supporting materials including building detailed financial models and business plans. (*Id.* ¶ 15). The business plan contained the following: an executive summary; several sections discussing the description of GM Financial Bank; a marketing plan with subsections for product strategy, market analysis, economics of the market, and competitive analysis; a management plan with subsections discussing the directors and officers and their responsibilities, organization structure, management training and succession; records, systems, and controls; a financial management plan with subsections for capital and earnings, liquidity and funds management, sensitivity to market risk, and credit risk; monitoring and revisions to a business plan; and financial projections. Underlying that business plan, GM Financial developed at least six financial models covering a three-year period, each modeling a specific economic scenario, which not only forecasted the financial health of GM Financial Bank under expected conditions, but also to demonstrate how the GM Financial Bank would withstand adverse economic conditions. (*Id.* ¶ 17).

Because GM Financial had not yet commenced operations, it had no historical financial information available for GM Financial to use as a basis for the financial models. (*Id.* ¶ 19). However, due to its more than 30 years in the lending business, GM Financial had developed a proprietary database of various financial and credit-related metrics and information (the "Credit Data"). (*Id.*). The Credit Data was critical for GM Financial in building the financial models needed to apply for the ILC. (*See id.* ¶ 21). In January 2026, the Board of Directors of the

FDIC and Commissioner of the UDFI conditionally approved the establishment of GM Financial Bank, as an FDIC-insured, Utah state-chartered ILC. (*Id.* ¶ 25).

While applying for GM Financial Bank's ILC, GM Financial hired Defendant as the Senior Vice President Chief Financial Officer ("CFO") – ILC. (*Id.* ¶31). He was also named in the FDIC application as GM Financial Bank's CFO. (*Id.* ¶ 31). As CFO, Defendant's responsibilities and duties included presenting and answering questions about the financial aspects of GM Financial Bank's business plan from the FDIC and UDFI during their field investigation associated with the application, managing the updating of the business plan through successive iterations and resubmissions to the FDIC and UDFI over the five year course of the application, preparing the ILC project's cost center annual expense budget and track progress of actuals against the same, and serving on the ILC project's senior management team in preparation for standing up the Bank after regulatory approval. (*Id.* ¶ 32). This required that he work with other senior executives, both on the ILC team and across GM Financial, to help manage and advance those efforts. (*Id.*).

As part of his employment with Plaintiffs, Defendant agreed to comply with Plaintiffs' policies and procedures including GM Financial's Code of Conduct and Business Ethics – Global Policy (the "Code of Conduct") and the Acceptable Use Policy – Global (the "Acceptable Use Policy"). (*Id.* ¶ 36). Relevant here, the Code of Conduct provides: "The obligation of employees to protect [GM Financial]'s assets includes its intellectual property. Intellectual property includes trade secrets . . . Unauthorized use or distribution of this information would violate this Code and could also be considered illegal and result in civil/criminal penalties." (Code of Conduct at 17, Ex. 3 to Mot. TRO, ECF No. 8-3). Also relevant here, the Acceptable Use Policy states: "Users must not print [GM Financial] information outside of [GM Financial] facilities unless specifically required by job function or authorized by their Executive Vice President (EVP)." (Acceptable Use Policy at 3, Ex. 2 to

Mot. TRO, ECF No. 8-4).

On March 10, 2026, Defendant emailed Senior Vice President Chief Executive Officer ("CEO") – ILC William Donnelly, informing him that he planned to retire. (Donnelly Decl. ¶ 31, Ex. A to TRO, ECF No. 8-1).  Defendant explained that he planned to work until April 17, 2026, before taking PTO and vacation time until June 3, 2026, his official last day. (*Id.*).  Later that month, a GM Financial Human Resources employee, notified Defendant that company policy did not permit him to use PTO during the notice period (*i.e.*, the time from his last day of work to the last day of employment) and that his last day of employment would be April 17, 2026. (*Id.* ¶ 42).

A few days later Defendant used his work email account to send "a highly confidential memorandum" prepared by attorneys representing GM Financial in the establishment of GM Financial Bank to his personal email address. (*Id.* ¶ 43).  The next day, Defendant forwarded another email to his personal email account attaching a workbook that contained information such as ratio analysis output, key assumptions, regulatory ratios and KPIs, investment mix, loan origination planning and forecasts, operating expenses, deposit analysis, and capital analysis. (*Id.* ¶ 44).  He then forwarded seven separate Excel files, six of which were financial models, a file containing financial accounts, and an internal memorandum from the fourth quarter of 2025 discussing treatment of credit losses at GM Financial. (*Id.* ¶¶ 45–47).  Defendant admits to sending all of these emails. (*See generally* Katauskas Decl., Ex. 1 to Resp., ECF No. 16-1).

GM Financial's Human Resources representative contacted Defendant regarding the forwarding of these emails, alleged that Defendant violated company policy, and attempted to remediate the issue. (Donnelly Decl. ¶ 49, Ex. A to TRO).  The matter went unresolved and GM Financial terminated Defendant's employment effective April 17, 2026. (*Id.* ¶ 50).

Plaintiffs filed the instant lawsuit pleading claims for trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and the Nevada Uniform

Trade Secrets Act ("NUTSA"), Nevada Revised Statute 600a. (*See generally* Compl.). Plaintiffs now move for a Temporary Restraining Order and Preliminary Injunction against Defendant.

## II.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 65 governs preliminary injunctions and temporary restraining orders. Fed. R. Civ. P. 65.  The standard for both forms of relief is the same. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Furthermore, a temporary restraining order "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974).  The Court may issue a temporary restraining order or a preliminary injunction if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## III.    **DISCUSSION**

Plaintiffs Motions for TRO and Preliminary Injunction are based on their claims for trade secret misappropriation under the DTSA and NUTSA. (*See generally* Mot. TRO, ECF No. 8); (*See generally* Mot. for Prelim. Inj., ECF No. 10).  Because the Court finds that Plaintiffs fail to demonstrate a likelihood of success on the merits of their DTSA and NUTSA claims, the Court need only discuss the first *Winter* element.

To demonstrate a likelihood of success on the merits, Plaintiffs must show a "fair chance of success" on its claim that Defendant used or disclosed its trade secrets in contravention of a "duty not to disclose." *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc); *Indep. Techs., LLC v. Otodata Wireless Network, Inc.*, 836 F. App'x 531, 533

(9th Cir. 2020).  Plaintiffs bring their trade secret misappropriation claims under the federal DTSA and the NUTSA.  "To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020); *see* 18 U.S.C. § 1839(5).  The NUTSA requires similar elements: (1) a valuable trade secret, (2) misappropriation, and (3) breach of a contract or misappropriation by a party with a duty not to disclose. *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000).  The Court therefore analyzes the claims together.  Because the Court finds that the misappropriation element is unsatisfied under *Winter*, the Court only addresses this element.

Misappropriation under the DTSA or NUTSA requires a showing of (1) acquisition of a trade secret by a defendant that knows or has reason to know was acquired by improper means, or (2) disclosure or use of a trade secret by a defendant that knew or had reason to know that the trade secret was (i) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret; or (ii) derived from or through a person who owed a duty to maintain the secrecy of the trade secret. *See* 18 U.S.C. § 1839(5)(A), (B)(ii)(II)–(III); NRS 600A.030(2)(a), (c)(2)(II)–(III).  "Improper means" expressly encompasses theft, misrepresentation, and the breach or inducement of a breach of a duty to maintain secrecy or contract. 18 U.S.C. § 1839(6); NRS 600A.030(1).  Misappropriation therefore includes violations of contractual confidentiality, non-solicitation, and non-use provisions. *See* 18 U.S.C. § 1839(6) (defining improper means to include "breach or inducement of a breach of a duty to maintain secrecy"); NRS 600A.030(d)–(e) ("Willful breach or willful inducement of a breach of a duty to maintain secrecy" and "imposed by. . . contract. . . .").

Plaintiffs alleged that Defendant acquired trade secrets through improper means when he

emailed the at-issue documents to his personal email and then printed them in violation of company policy and without authorization. (Mot. TRO 20:24–21:8).  Defendant admits to emailing the at-issue documents to his personal email address from his work email and then printing them, but denies using or misappropriating Plaintiffs' purported trade secrets. (*See generally* Resp., ECF No. 16).

Defendant states that he emailed himself certain documents to print and review "to carry out [his] final tasks during [his] notice period." (Katauskas Decl. ¶ 18, Ex. 1 to Resp.).  He explains that on March 30 and 31, 2026, he sent five emails from his work email to his personal email so he could print and review materials in preparation for a transition meeting with the incoming CFO. (*Id.* ¶ 20).  He explains that the items he emailed to himself on those dates related to GM Financial Bank's FDIC application and the use of the Federal Reserve's § 250.250 exemption, GM Financial Banks' pro forma baseline and related stress scenarios, a loan allowance memo, and information regarding the general ledger chart of accounts that GM Financial Bank would be using. (*Id.* ¶ 21).  He further states that on March 30, 2026, he sent himself personal information that he had prepared in his role as CFO which included a draft IBFR, an IBFR excel workspace, and his resume because he wanted to have copies of all his personal information that he had provided to the FDIC, in case the FDIC ever contacted him after his retirement from GM Financial Bank. (*Id.* ¶ 22).

### A.  Act of Emailing

The Court begins by discussing Defendant's act of emailing alleged trade secrets to his personal email.  Plaintiffs argue that Defendant acquired their alleged trade secrets through improper means because the Code of Conduct requires employees to safeguard trade secrets. (Reply 4:22–5:2, ECF No. 19).  GM Financial's Code of Conduct provides: "The obligation of employees to protect [GM Financial]'s assets includes its intellectual property.  Intellectual property includes trade secrets . . . Unauthorized use or distribution of this information would

violate this Code and could also be considered illegal and result in civil/criminal penalties." (Code of Conduct at 17, Ex. 3 to Mot. TRO).  Defendant acknowledges this provision of the Code of Conduct but contests that this provision, or any other provision, expressly forbids sending documents to a personal email. (Resp. 15:11–19, ECF No. 16).  Plaintiffs argue that Defendant's attempt to limit misappropriation to circumstances where a binding confidentiality agreement or company policy prohibits Defendant from sending trade secrets to his personal email disregards both the plain language of the DTSA and case law. (Reply 4:6–10).  But, as discussed below, the cases Plaintiffs rely on to support this argument are materially distinguishable from the matter here.

In *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, a court considering a Motion for TRO on a trade secret claim found that the misappropriation element was satisfied where former employees copied company files and folders consisting of trade secrets at the time of their resignation or within a short time thereafter. 444 F. Supp. 3d 1198, 1207 (E.D. Cal. 2020).  The court found that these actions strongly suggested the employees intended to use the information in their employment with a competitor whom the employees began to work for after leaving the plaintiff's company. *Id.*  And in *Cutera, Inc.*, there was evidence that the competing company deployed the plaintiff's sales method, claimed to be a trade secret, as their own method.  Here, in contrast, Defendant sent emails to his personal email after he announced his retirement but before he ceased his employment with Plaintiffs.  Moreover, there is no evidence of Defendant going to work for a competing company, nor that a competing company has deployed Plaintiffs' alleged trade secrets as their own.

In *WeRide Corp. v. Kun Huang*, the district court found that the plaintiff was likely to succeed on a trade secrets claim where the defendant began downloading increased amounts of data to an external hard drive around the same time that he began considering other employment, deleted several files from a company laptop, cleared its web browsing history,

and erased the hard drive on another company laptop in his possession. 379 F. Supp. 3d 834, 848 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019). Again, there is no evidence here that Defendant emailed and printed alleged trade secrets in preparation for other employment, and Defendant states he did so to transition the incoming CFO and to be prepared in the event that the FDIC ever contacted him. Furthermore, there was a clear undertone of concealment in *WeRide Corp.*, that is not present here.

In *HighMark Digital, Inc. v. Casablanca Design Centers, Inc.*, the court denied summary judgment on the plaintiff's trade secret misappropriation claim because it held that "[a] jury could conclude that [the defendant] misappropriated [the plaintiff's] trade secrets when he retained the company's laptop and external hard drive seven to ten business days after he resigned and returned the laptop wiped of its data." No. CV-18-06105-SJO-JPR, 2020 WL 2114940, at *21 (C.D. Cal. Mar. 26, 2020). There are no analogous facts before the Court here and this case is not at the summary judgment stage.

Plaintiffs' misappropriation theory here requires Defendant to acquire, use, or disclose the alleged trade secrets through improper means (*i.e.* theft, misrepresentation, and the breach or inducement of a breach of a duty to maintain secrecy or contract). *See* 18 U.S.C. § 1839(6); NRS 600A.030(1). Plaintiffs fail to establish, however, how Defendant's action of emailing alleged trade secrets to his personal email was unauthorized such that it violated the Code of Conduct or otherwise breached a duty to maintain secrecy. For instance, as Defendant points out, Plaintiffs do not identify a provision of company policy that prohibits employees from emailing intellectual property from a work email to a personal email. Without establishing how Defendant acquired, used, or disclosed trade secrets through improper means, Plaintiffs fail to demonstrate a likelihood of success under *Winter* that Defendant's act of emailing alleged trade secrets to his personal email satisfies the misappropriation element under the DTSA or

NUTSA.

**B.    Act of Printing**

The Court now turns to analyzing Defendant's act of printing alleged trade secrets from his home printer.  To support their misappropriation claim, Plaintiffs point to GM Financial's Acceptable Use Policy that states: "Users must not print [GM Financial] information outside of [GM Financial] facilities unless specifically required by job function or authorized by their Executive Vice President (EVP)." (Acceptable Use Policy at 3, Ex. 2 to Mot. TRO).  In response, Defendant states that, because he worked remotely, he lacked access to GM Financials' onsite printing facilities and was required to print from his home computer. (Katauskas Decl. ¶ 18, Ex. 1 to Resp.).  He explains that the remote environment deployed by GM Financial did not allow him to print documents on his home printer directly from his work email account. (*Id.*).  Defendant contends that he was required to occasionally print documents from home to fulfill his job function. (Resp. 6:23–24).  Specific to the allegations in this matter, Defendant claims that he printed the at-issue documents "to carry out [his] final tasks during [his] notice period." (Katauskas Decl ¶ 18, Ex. 1 to Resp.).  Plaintiffs do not dispute this assertion in their Reply.  Significantly, printing GM Financial information outside of GM Financial facilities is permitted if required by job function. (Acceptable Use Policy at 3, Ex. 2 to Mot. TRO).  Because Plaintiffs do not dispute Defendant's claim that printing documents was required in order for him to perform his job, it is not clear that Defendant's act of printing documents at home violated GM Financial's Acceptable Use Policy.

Plaintiffs therefore fail to demonstrate that Defendant's act of printing alleged trade secrets establishes the misappropriation element of the DTSA or NUTSA claims because Plaintiffs' fail to establish the "improper means" requirement.  Thus, Plaintiffs have not established a likelihood of success on their claim that Defendant acquired, used, or disclosed purported trade secrets through improper means.  Because likelihood of success is a threshold

issue, the Court need not discuss the remaining three *Winter* elements. *Garcia v. Google, Inc.*, 786 F3d 733, 740 (9th Cir. 2015); *Baird v. Bonta*, 81 F4th 1036, 1040 (9th Cir. 2023).

IV.    **CONCLUSION**

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Temporary Restraining Order, (ECF No. 8), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Order to Show Cause, (ECF No. 9), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Preliminary Injunction, (ECF No. 10), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Shorten Time, (ECF No. 11), is **DENIED** as moot.

**DATED** this ___5___ day of June, 2026.

_____

Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT